NORTHERN RAILROAD v. CONCORD RAILROAD & A.

The Northern Railroad brought a bill in equity against the Concord Railroad to enforce a contract made by a former board of directors of the Concord Railroad, substantially transferring the management of the Concord Railroad to the Northern Railroad for the term of five years. Upon the evidence, a majority of the court found that the controlling purpose of the directors of the Concord Railroad, in making the contract, was to prevent the management of the road from passing into the hands of a new board of directors, whose election at the next annual meeting was generally anticipated; and that this purpose was known to the Northern Railroad. On this state of facts a majority of the court *held,* that the contract was invalid because of the purpose for which it was made.

In this case it was *held* by SARGENT, J., and SMITH, J., that there was not such reason to apprehend a perversion of the trust by the newly elected directors of the Concord Railroad as would justify the court in withholding from them the control of any portion of the corporate affairs, except certain pending suits which the new board had already been expressly enjoined from controlling.

In equity, upon a hearing on the merits, the court were equally divided on the question whether the bill should be dismissed. *Held,* that no judgment could be entered, that the cause remained pending, and that receivers, who had been appointed to hold the property during the pendency of the suit, would remain in possession.

IN EQUITY. Bill brought by the Northern Railroad against the Concord Railroad Corporation, and against Isaac Spalding, Frederick Smyth, John H. Pearson, James W. Johnson, Edson Hill, William R. Spalding, and William A. Tower, described as " directors of said Concord Railroad Corporation."

The bill alleges, among other things, that on the 29th day of April,

1870, for the purpose of providing for a more efficient, convenient, and economical management of the business of said Concord Railroad and said Northern Railroad, for the benefit of the public in better accommodations and with less rates of fares and freights, as well as to promote the interests of said parties respectively, a business contract in writing, under their respective corporate seals, was duly made and entered into between said Concord Railroad and the plaintiff, a copy whereof was annexed and made a part of the bill; whereby, among other things, it was mutually agreed by and between said parties, that the roads of said parties respectively from Concord to Nashua and from Concord to Bristol and White River Junction, together with the Suncook Valley road, the Concord and Portsmouth road, the Manchester and North Weare road, and the Hooksett branch road, so far and so long as said Concord Railroad Corporation had or might have any interest in and right of control over any of said last mentioned roads, should, for the term of five years from and after April 15, 1870, be operated and managed in connection with each other, under the name and style of the Concord and Northern Railroads, by a joint management under the charge, direction, and care of one agent, acting for and as the agent of both and each of said parties, who should be appointed by said Northern Railroad and be removable by them, but subject to the control of the boards of directors of both the contracting parties by concurrent votes, each board acting by itself, as is usual with boards of railroad directors in ordinary cases; and that the roads of the contracting parties, and the other roads before mentioned, together with all the lands used in connection therewith, and the privileges and appurtenances thereto belonging, with the rights and franchises of said roads respectively, all the depots, shops, and other buildings, and all fixtures on said roads and lands used for the purposes of said roads, all the furniture, machinery, and fixtures in use in said depots, shops, and other buildings, all the engines, cars, tools, shop stock, materials for repairs, wood, oil, and other articles of property on hand belonging to either of the contracting parties intended for the purposes of said roads, and all other property and premises belonging to either of the contracting parties, except the premises in said Concord, at the corner of Freight and Main streets, under written lease to Harvey and others, should be placed in the possession and be and remain subject to the control of said joint management, for the uses and purposes thereof, during the continuance of said contract:

That, subsequently, the said contract was sanctioned in writing by the railroad commissioners for said State, and approved by the governor and council thereof, in accordance with the requirements of law; and thereafterward Onslow Stearns was duly appointed by the plaintiff, with the concurrence and assent of said Concord Railroad, the sole agent to assume and exercise the charge, care, direction, and control of the joint management of the respective roads of the contracting parties and of the other roads aforesaid, and accepted the trust confided to him; and thereupon the contracting parties, in accordance with the provisions of said contract, placed in the possession and delivered over

to said Stearns, sole agent for the joint management aforesaid, for the purposes of said management, all the aforesaid roads, and all other property and premises belonging to either of the contracting parties, except the premises at the corner of Freight and Main streets in said Concord as aforesaid, to hold and enjoy, manage and control the same, for the purposes of said joint management only.    *    *    *

The bill further avers, that before the 29th day of April, 1870, as the plaintiff is informed and believes, the said Isaac Spalding, Frederick Smyth, John H. Pearson, James W. Johnson, Edson Hill, William R. Spalding, and William A. Tower, associating, confederating, and combining together, and with sundry other persons, to the plaintiff unknown, to obtain the control of said Concord Railroad, by purchasing, with money borrowed from savings banks under their control, and other sources, sufficient capital stock of said corporation to secure their own election by their own votes as directors thereof, for the purpose of so controlling the business of the road of said corporation and that of the other roads aforesaid connected therewith, by their action as directors in regulating the tariff for freight and passengers thereon, by dismissing or discharging pending suits in favor of said corporation against some of their associates, former conductors on some of said roads, and otherwise, that the public should be compelled to pay such fares as would accumulate, from the future earnings of said roads, a surplus sufficient to enable them to declare and pay extra dividends to themselves until the aggregate dividends on the stock of said corporation should average ten per cent. per annum from the date when it was paid into the treasury, and for the further purpose of procuring such legislation and making such arrangements as should enable said Concord Railroad successfully to consolidate its stock with that of other roads between Boston, Mass., and Ogdensburgh, N. Y., at double its par value, thus giving to each of them two dollars' worth of stock in the consolidated corporation for every dollar's worth owned by them in the Concord Railroad, and compelling the travelling and business community to pay ample dividends on this doubled capital, had purchased a large amount of the capital stock of said Concord Railroad, with the designs and for the purposes aforesaid ; and after the making of said contract, said Spalding and others, and their associates and confederates as aforesaid, regarding its existence and fulfilment as an effectual barrier to the present consummation of their schemes for profit and gain, redoubled their previous efforts in the purchase of the stock of said Concord Railroad, with the avowed design of breaking up and preventing the execution of said contract; and, so successful were they in purchasing stock and procuring proxies, that they were able to control the annual meeting of said corporation, holden at Phenix Hall, in said Concord, on the 24th day of May, 1870, elect themselves directors of said corporation by votes thrown by themselves, pass resolutions repudiating, denouncing, and setting aside, as wholly unauthorized, in violation of their rights as stockholders, illegal, null, and void, the aforesaid contract of April 29, 1870, and instructing themselves to " adopt such measures as in their judgment may be

deemed expedient to assert and maintain the rights of the stockholders to the road and other property " of said corporation.

The bill further alleges, that the said Isaac Spalding and others, directors of said Concord Railroad, openly avow their determination to prevent the fulfilment and execution of said contract on the part of said corporation, and have demanded of said Onslow Stearns, agent for the joint management provided for in said contract, possession of said road of the Concord Railroad and of said connecting roads, and of all the property placed under his control, as such agent, by the Concord Railroad, agreeably to the provisions of said contract; and the plaintiff further says, that it is informed and believes that said Isaac Spalding and others, directors as aforesaid, have openly avowed their purpose to treat said contract as utterly null and void, and have threatened and do still threaten to wrest the road of said Concord Railroad and said other connecting roads, with all property belonging to said Concord Railroad and to said connecting roads, *by force and violence*, from the possession and control of said Onslow Stearns, sole agent for the joint management provided for in said contract, and themselves to assume the management and control of all said roads and property, with a view to the accomplishment of the speculative purposes for which they purchased the capital stock of said Concord Railroad, and in express violation of the covenants and agreements on the part of said Concord Railroad in said contract contained; and said Isaac Spalding and others, directors aforesaid, utterly refuse to carry out and perform the provisions and stipulations of said contract on the part of said corporation and on their own part.

And the plaintiff further says, that had they not been restrained by temporary injunction, said Isaac Spalding and others, directors aforesaid, would, in its belief, soon after their election as directors, have carried their threats into execution, and wrested, or have attempted to wrest, *by force and violence*, from the possession and control of said Stearns, agent as aforesaid for the joint management under the contract of April 29, 1870, the road of said Concord Railroad, and its connecting roads as aforesaid, with all the other property aforesaid, and the plaintiff fears and verily believes that, if not continually hereafter so restrained, they will at once carry or attempt to carry said threats into execution in like manner, to the great and irreparable injury of the plaintiff.

Wherefore, inasmuch as it can have adequate relief in the premises only in a court of equity, the plaintiff prays that the defendants may be required severally to answer all and singular the foregoing allegations, charges, and complaints, as fully and particularly as if the same were here repeated and they were each specially interrogated in relation thereto ; * * * that said contract of April 29, 1870, may be decreed to be valid and binding upon the defendants, and that they may be decreed specifically to fulfil and perform the same agreeably to its terms and provisions ; and, to prevent injustice and great and irreparable injury to the plaintiff, that a writ of injunction may be issued to restrain the defendants, and all officers, agents, and others acting

under their authority, and all other persons, from interfering in any way whatever, with the possession and control of the road of said Concord Railroad, said Suncook Valley road, the Concord and Portsmouth road, the Manchester and North Weare road, and the Hooksett branch road, or with the possession and control of the other property of said Concord Railroad, or belonging to any of said other roads, during the continuance of said contract of April 29, 1870, by said Onslow Stearns, agent for the joint management provided for in said contract, or by his successor or successors in that office or trust; and that such other and further relief may be granted to the plaintiff as may seem just and equitable.

The bill was filed May 30, 1870.   August 17, 1870, the plaintiff amended the bill by inserting the following allegations :

" The plaintiff further says, that the said Isaac Spalding, Frederick Smyth, John H. Pearson, James W. Johnson, Edson Hill, William R. Spalding, and William A. Tower, at the time said scheme was devised for obtaining control of said Concord Railroad, were the owners of but a small amount of stock in said corporation ; nor did they then, or at any time afterwards, have on hand but a small part of the money necessary for carrying out said scheme, without borrowing the same ; nor did they then, or at any time afterwards, have any considerable amount of money which they had occasion to invest; nor did they consider said stock, nor was it in fact, a good investment at the prices paid for the same, unless it should be made so by some means other than the payment of proper and legitimate dividends thereon ; but the said Isaac Spalding, Frederick Smyth, John H. Pearson, James W. Johnson, Edson Hill, William R. Spalding, and William A. Tower, associating, confederating, and combining with Moody Currier of Manchester in the county of Hillsborough, Anson S. Marshall of Concord in the county of Merrimack, John A. Spalding and Edward H. Spalding, both of Nashua in said county of Hillsborough, Reed P. Silver, Joseph B. Clark, and Charles Williams, all of said Manchester, Natt Head of Hooksett in said county of Merrimack, and others to the plaintiff unknown (it being understood and agreed that if the said scheme should be successful the said Moody Currier was to be elected treasurer and the said Anson S. Marshall clerk of said corporation, and that the said Isaac Spalding would soon voluntarily cease to hold the office of director, and that the said John A. Spalding was to be elected in his place), made use, in violation of law, of money belonging to, or borrowed, in violation of law, from the Merrimack River Savings Bank, located at said Manchester, and under the control of said Frederick Smyth, who was treasurer and a trustee thereof, the said Charles Williams being also a trustee ; from the First National Bank, located at said Manchester, and also under the control of said Frederick Smyth, who was cashier thereof, the said Joseph B. Clark and Natt Head being directors thereof; from the Amoskeag Savings Bank, located at said Manchester, and under the control of said Moody Currier, who was president and treasurer thereof; from the Amoskeag National Bank, located at said Manchester, and also under the control

of said Moody Currier, who was president and a director thereof, the said Edson Hill and Reed P. Silver being also directors ; from the City Savings Bank, located at said Nashua, and under the control of said Edward H. Spalding and John A. Spalding, relatives of the said Isaac Spalding and William R. Spalding, the said Edward H. Spalding being treasurer and the said John A. Spalding a trustee thereof; from the First National Bank, located at said Nashua, and under the control of said John A. Spalding and Edward H. Spalding, the said John A. Spalding being cashier and the said Edward H. Spalding a director thereof ; from the National Savings Bank, located at said Concord, of which the said John H. Pearson, James W. Johnson, and Anson S. Marshall were trustees ; from the First National Bank, located at said Concord, of which the said James W. Johnson was a director; and from other Savings and National Banks to the plaintiff unknown.

"And the plaintiff further says, that the defendants, confederating and combining as aforesaid, and for the purposes set forth in the plaintiff's bill, unlawfully procured a large number of votes to be cast for them as directors at said annual meeting, by persons who were not *bona fide* holders of stock in said corporation and who had no right to vote at said meeting, as the defendants then and there well knew, and by others who were *bona fide* stockholders therein, but who were induced by the defendants, and their associates and confederates, to vote for the defendants by corrupt considerations.

"And the plaintiff further says, that the aforesaid combination, and the purchasing of stock and procuring of proxies in pursuance thereof, for the purposes aforesaid, and all the votes cast on said stock by the defendants and their associates and confederates, at the annual meeting of said corporation held on the 24th day of May, 1870, were unlawful ; that the defendants were not legally elected directors of said corporation at said meeting, nor were the resolutions referred to in said bill legally passed, and that all the subsequent acts of said directors as such were and are void and of no effect."

The amended answers of the various defendants allege, that no business contract, in writing, was duly made and entered into between the said Concord Railroad and the said Northern Railroad, under their respective corporate seals, on the 29th day of April, 1870, as set forth in the bill, but the contract referred to in said bill was made and entered into by the directors of said corporations, for the time being, in the names of said corporations, without the authority of said corporations or their charters or other law, or any other authority whatsoever, and is invalid and of no effect; that said contract was not made by said directors as aforesaid for the purpose of providing for a more efficient, convenient, and economical management of the business of said Concord Railroad and said Northern Railroad, nor for the benefit of the public in better accommodations and with less rates of fares and freights, nor to promote the interests of said corporations respectively ; but was fraudulently made, with the intention by the parties thereto to defraud the said Concord Railroad and the public, and to prevent the stockholders of said Concord Railroad from managing and

·controlling its property and business by their directors, thereafterwards to be chosen; that said contract was one which could not be rendered valid and binding upon the plaintiff and the said Concord Railroad, by the sanction, in writing, of the railroad commissioners of said State, and the approval of the governor and council of said State, or either of such acts; that, even if said contract was one that could be rendered valid and binding in this manner, it was not so sanctioned by said railroad commissioners, nor approved by the governor and council, in accordance with the requirements of law, and for these reasons also is invalid and of no effect.    *    *    *

And the defendants further say, that the stockholders of said Concord Railroad, at their annual meeting aforesaid, did pass resolutions wherein they condemn the official action of their former president and directors, in reference to the contract aforesaid, and set aside the said action as wholly unauthorized and illegal, and in violation of the rights of said stockholders and the public, and pronounce the same null and void, and instruct their board of directors, that day chosen as aforesaid, to adopt such measures as in their judgment may be deemed expedient to assert and maintain the rights of the stockholders to the road and other property of said Concord Railroad; but the defendants deny that said Isaac Spalding and others, directors as aforesaid, have threatened and do still threaten to wrest the road of said Concord Railroad and said other connecting roads and its other property aforesaid from the possession or control of the said Stearns by any improper or unlawful force; or that they would have so done, or attempted to so do, soon after their election as directors, had they not been restrained by said temporary injunction; or that they will attempt to do so, by the use of improper or unlawful force in the future, unless restrained by injunction from so doing; or that they would assume the management or control of all said roads and property, or any portion thereof, with a view to the accomplishment of any speculative purposes whatsoever.

The answers further allege, that ·Onslow Stearns, president of the Northern Railroad, Josiah Minot, president (until May 24th, 1870) of the Concord Railroad, and other persons, had formed a plan to consolidate the Concord Railroad and the Northern Railroad with other railroads; that the said Isaac Spalding, Frederick Smyth, John H. Pearson, James W. Johnson, Edson Hill, William R. Spalding, William A. Tower, Moody Currier, Anson S. Marshall, Edward H. Spalding, Reed P. Silver, Joseph B. Clark, Charles Williams, Natt Head (all of whom, except said Tower and William R. Spalding, were citizens and residents of the State of New Hampshire, and, with their friends and relatives and neighbors, interested as stockholders and in business relations in the management of the said Concord Railroad), were justly apprehensive that, through the power and influence of the said Onslow Stearns, Josiah Minot, and their associates, as aforesaid, the said Concord Railroad would be brought into said consolidation, to the great detriment of all good citizens of the State of New Hampshire, and were also desirous of effecting a reduction in the rates of local fare and freight upon said Concord Railroad, which they believed to be unreasonable

and disproportionately high, and were also desirous of effecting a reduction of the expenses of said corporation, and economy in the administration of its affairs, and for these and other lawful objects, were desirous of effecting a change in the directors and officers of said Concord Railroad; and being, most of them, already the owners of stock in the said railroad, and some of them to a large amount and of long standing, they, in February and March, 1870, coöperated with each other, and with divers other good citizens of the State of New Hampshire, in becoming the owners of stock, and using their influence, by the use of proper means, with a view of obtaining such a number of shares in said Concord Railroad as should enable them to accomplish their lawful purposes aforesaid; and in the purchase of said stock, although they bought more stock than they would have purchased if their object had been investment simply, they paid no more for it than they believed it would be worth with proper management of the road, and no more than was paid by the said Josiah Minot and his associates, who also made strenuous efforts, by purchasing stock and by other means, to prevent the accomplishment of the purposes aforesaid; and although the persons named in the plaintiff's bill, in the prosecution of their aforesaid object, or some of them, hired money of the savings banks mentioned in said bill, as they lawfully might, it was not borrowed or applied in violation of any law, official duty, or trust; nor did said defendants, or any of them, procure any votes to be cast for directors, at the annual meeting of said corporation, by any corrupt or unlawful considerations, or by any persons who were not *bona fide* holders of stock, or proxies of stock, in said corporation, or of any persons who had not a right to vote at said annual meeting; * * * that the said Minot and Stearns, being fully aware that a majority of the votes at the coming annual meeting of the Concord Railroad would elect a new board of directors who would wholly oppose their schemes and prevent their accomplishment, with the express design to forestall and render nugatory the opposition of a majority of the stockholders at said annual meeting, and the action of the board of directors that should there be chosen, and to secure to the said Minot and Stearns and their confederates the control and management of said Concord Railroad, and the payment of all its net current income over ten per cent. upon its capital stock to the Northern Railroad, and thereby deprive the said Concord Railroad of any reserved fund for extraordinary necessary expenditures, increase of furniture and permanent works, such as should be required by the natural increase of business, and deprive the State of its just right to the surplus earnings of the road, and also in furtherance of the scheme of consolidation aforesaid, on or about the 29th of April, 1870, procured the formal execution of the instrument named in said bill, and the said Stearns approved the same as governor, and procured two of the railroad commissioners, meeting at Boston in the State of Massachusetts, in the absence of, and without notice to, the third commissioner, or any substitution of any person in his place as by law provided when a commissioner is disqualified, and it having been expressly agreed and understood that the said

Stearns himself should be the agent contemplated by the said instrument, in whose hands should be placed the entire property of the Concord Railroad and its dependencies, and the management thereof, to the exclusion of the directors for the time being, as provided by the charter, for the term of five years; and the said Stearns and Minot and all of the officers of the Northern Railroad and Concord Railroad, by whom said contract was entered into or approved, well knowing the unlawful purposes for which said instrument was made; that the said instrument, if otherwise valid, was fraudulent and void by reason of the manner and motives in and with which it was entered into and approved; that it was not such an instrument as could be made by the corporation itself without the previous authority of the legislature, which had not been obtained; that it was not in the power of the directors of the Concord Railroad for the time being to take from their successors the supervision, management, and control of the railroad, and from the corporation itself, its own property, for the period of five years as therein attempted; that the defendants named as directors in said bill were legally and properly chosen as such, at said annual meeting, by a large majority of all the legal votes, and were afterwards, on the same day, duly organized as a board of directors; that the said defendants had no purpose at any time of increasing the rates of fare and freight upon said Concord Railroad, but, on the contrary, intended to reduce the same; that they did not, at any time, have any purpose or intention of taking any action in reference to the suits mentioned in said bill, other than such as should be legal and proper, and for the best interests of the corporation, nor was there, at any time, any agreement or understanding that any other disposition should be made of said suits; that the said defendants had at no time any purpose or intention to declare and pay, or induce any other persons to declare and pay, any extra dividends to themselves or others, nor did they at any time enter into any agreement with other persons for any such object; that they did not at any time have any purpose or intention of effecting in any way any increase of the capital stock of said corporation by any means whatever; that they did not at any time have any purpose or intention of effecting or giving any countenance to the consolidation project mentioned in said bill, but, on the contrary, one motive which they had in endeavoring to effect a change in the board of directors was to defeat and prevent the accomplishment of any such object; and they wholly repudiate and deny all unlawful combination, intention, or motive, or action, charged in said bill, and insist that said pretended contract is a fraud on their rights, illegal, null, and void.

May 24th, 1870, a temporary injunction was issued, restraining the newly elected directors of the Concord Railroad from taking possession of the road. At June law term, 1870, a motion to dissolve this injunction was argued at length. The term was adjourned to August, 1870, when an order was made placing the Concord Railroad in the hands of receivers during the pendency of this suit. At December term, 1870, the case was submitted upon the pleadings, and the evidence taken by both parties. The members of the court who sat in

the cause differed in their findings of fact upon this evidence, and delivered opinions *seriatim.* It is assumed that the conclusions of fact arrived at by each judge will sufficiently appear in the respective opinions.

*Perley, Tappan, E. A. Hibbard, Pike, Fowler,  C. F. Choate, Minot, Mugridge,* for plaintiff.

*B. R. Curtis* (of Massachusetts), *Harry Bingham, Marshall & Chase, Edmund Burke, Eastman, Page & Albin, C. R. Morrison, Rolfe,* for defendants.

*Smith, J. Upon the evidence, I find that the old board of directors, at the time of making the contract, believed that they were going to be voted out of office at the coming election by the friends of the new board; that they made the contract for the express purpose of preventing the incoming directors from assuming the management of the corporate affairs; and that, without this purpose, they would not have made the contract. I find also that these facts were known to the other contracting party, the Northern Railroad. Upon these findings I hold the contract void, for substantially the same legal reasons as those expressed by Judge Doe.

It has been suggested that there is such reason to apprehend perversion of the trust by the legally elected directors of the Concord Railroad as will justify the court in continuing the receivership and withholding from them the possession and control confided by the charter to the directors " for the time being." Upon all the evidence, I am not satisfied that there is cause for withholding from the new directors the management of any portion of the corporate affairs, except the suit against George Clough and the suits against other former conductors. By the injunction just issued in *Fisher & a.* v. *Concord Railroad & a.,* the new board are already prohibited from controlling those suits. I am in favor of dismissing this bill brought by the Northern Railroad; thereby discontinuing the general receivership, but leaving in force the order just made in *Fisher* v. *Concord Railroad,* by which a receiver was appointed to take control of the suits against former conductors.

It appears that two (Sargent, J., and Smith, J.) of the four justices who sit in this cause, are of opinion that the bill should be dismissed at this time, but that the two remaining justices (Bellows, C. J., and Doe, J.) think otherwise. The court being thus equally divided, can any final disposition be made of the cause at this time?

In the absence of any statute provision applicable to such a case, no judgment can be rendered except by a majority of the members of the court. When a court, consisting of several members, is equally divided on any order, "it seems to be a proposition too plain for argument that the court can do nothing." " If affirmative action is necessary

---

* Foster, J., and Ladd, J., did not sit.

for the further progress of the cause, the division operates as a stay of proceedings;" see WARE, J., in *Goddard* v. *Coffin*, Daveis 381, 388; FIELD, J., in *Durant* v. *Essex Co.*, 7 Wallace 107, 110; Tidd's Practice 930; 3 Chitty's Gen. Practice (Am. ed. of 1836) 10; Ram. on The Science of Legal Judgment, Am. ed., 49. The difficulty can, of course, be removed by an agreement among the judges. There may be cases where, notwithstanding an equal division on the intrinsic merits, the judges may agree that it is expedient to render judgment and thus finish the litigation, rather than to allow a dead-lock to continue indefinitely; and there may be a standing agreement among the members of a court to render a certain judgment in all such cases situated in a certain position—see CHAPMAN, J., in *Durant* v. *Essex Co.*, 8 Allen 103, 107–8. If there exists in the courts of other jurisdictions a uniform practice of rendering judgment for the one party or the other in cases situated like the present, the standing agreement among the members of those courts might have weight in inducing us to agree to make a similar final disposition of this case. We have examined numerous reported cases where the court were equally divided,* but we fail to find a uniform practice of rendering judgment for or against either party in cases analogous to the present. On the contrary, the weight of precedent seems to be against such a course. The cases which have, for all practical purposes, been finally disposed of by a divided court, are mostly dissimilar to the present. Thus, where the judges of a court of error or appeals are equally divided upon the question of affirming or reversing the judgment rendered in a lower court, the judgment of the court below is affirmed; *Etting* v. *Bank of U. S.*, 11 Wheaton 59; *Durant* v. *Essex Co.*, 7 Wallace 107 (and appendix p. 753); *Bridge* v. *Johnson*, 5 Wendell 342, 371–5; *Baring* v. *Shippen*, 2 Binney 154, 173; *Reg.* v. *Millis*, 10 Clark and Finnelly 534, 907; *Baker* v. *Lee*, 8 House of Lords Cases 495, 512; *Deighton* v. *Greenville*, 2 Shower 46, note; *Hickman* v. *Cox*, 3 C. B. (N. S.) 523, 568; *Warburton* v. *Loveland*, 1 Huds. & Brooke (Irish Exchq. Chamber) 623, 725; *Hammond* v. *Ridgely's Lessee*, 5 Har. & J. 245, 284; *Blanchard* v. *Has-*

---

* Besides the cases referred to in the opinion, see also *Pickering* v. *Appleby*, 1 Comyn 354; *Jeveson* v. *Moor*, 12 Modern 262, S. C. (as *Iveson* v. *Moore*), 1 Lord Raymond 486, 1 Salkeld 15; *Rex* v. *Stone*, 1 East. 63; *Dean, &c., of Rochester* v. *Pierce*, 1 Campbell 466, p. 468; *Levy* v. *Green*, 4 Jurist N. S. 86; *Dansey* v. *Richardson*, 3 El. and Bl. 144, 722; *Chilton* v. *L. & C. Railway Co.*, cited in note 3, El. and Bl. 722; *Reed* v. *Davis*, 4 Pick. 216; *Guild* v. *Guild*, 15 Pick. 129; *Shannon* v. *Shannon*, 10 Allen 249; *Jewell's Lessee* v. *Jewell*, 1 Howard U. S. 219, 234; *Penniman* v. *Perce*, 9 Michigan 509; *Michigan &c. R. R. Co.* v. *Leahey*, 10 Mich. 193; *Com.* v. *Beaumarchais*, 3 Call 122; *Hatton* v. *Weems*, 12 Gill & Johnson 83; *Brown* v. *Aspden*, 14 Howard U. S. 25; *Kemper* v. *Trustees of Lane Seminary*, 17 Ohio 293, 329; *Kerr* v. *Whiteside*, 1 Breese, Appendix 6; *Ableman* v. *Booth*, and *U. S.* v. *Booth*, 11 Wisconsin 498; *Lanning* v. *London*, 4 Wash. C. C. 332.

*ler*, 6 Monroe 193 ; *Tuck* appellant v. *Barnard & als.* appellees, Superior Court of N. H., Rockingham, Sept. term, 1805, where the court (WINGATE, J., and LIVERMORE, J.) being equally divided upon an appeal from the probate court, the decree of the judge of probate was affirmed. So, where there is a higher court to which the case can be carried, the judges of a lower court have sometimes rendered a *pro forma* judgment, in order to admit of an appeal or a writ of error ; see *Thornby* v. *Fleetwood*, 1 Strange 318, 379 *et seq.* ; *Deane* v. *Clayton*, 7 Taunton 489, 507–8, 536 ; *Cockle v. L. & S. E. Railway Co.*, Law Reports, 5 Com. Pleas, 457, 472. Again, the position of a case may be such that a failure to decide the particular point upon which the court are divided does not prevent the rendition of final judgment. If, for example, there is a general rule entitling a party who has obtained a verdict to an entry of judgment unless cause is shown to the contrary, and it happens that the court are equally divided as to setting aside the verdict or arresting judgment, the party has his judgment under the general rule, "there being no rule made to stay it." He does not require affirmative action on the part of the court; see *Chapman* v. *Lamphire*, 3 Modern 155 ; *Walmsley* v. *Russell*, 6 Modern 200, 203 ; *Foot* v. *Tracy*, 1 Johnson 46, 54 ; WARE, J., in *Goddard* v. *Coffin*, Daveis 381 ; FIELD, J., in *Durant* v. *Essex Co.*, 7 Wallace 107, 110.

None of these authorities are applicable to the present case. Here is no order or judgment of a lower court to be reversed or affirmed ; nor is there any higher court to which the cause can be carried on appeal or error, if a *pro forma* judgment should now be rendered. The position of this case is not dissimilar to the cases in the English courts of law, where there is a special verdict, or a case reserved for the opinion of the court *in banc*, or where a verdict has been taken, subject to the opinion of the court *in banc*. In such cases, if the court are equally divided, no judgment is rendered for or against either party. In *Buxton* v. *Mingay*, 2 Wilson 70, a verdict was found for the plaintiff, subject to the opinion of the common pleas upon a case made. The judges being equally divided, WILLES, C. J., said, p. 73, " therefore, as the court is equally divided, there can be no rule, but let the *postea* remain in court." In *Boulton* v. *Bull*, 2 Hen. Blackstone 463, "a case was reserved for the opinion of the court." The court being equally divided, " no judgment was given ; " * * * see p. 500. In *Deane* v. *Clayton*, 7 Taunton 489, a verdict was found for the plaintiff, subject to a point which DALLAS, J., reserved. After argument upon a rule *nisi*, the court " directed that the case should be turned into a special verdict, and that it should be again spoken to." BURROUGH, J., in delivering his opinion, said, p. 507–8 : " If I still find that the court is divided on the question, thinking it, as I do, a matter of great importance to the public, and to be a case that ought to be decided the one way or the other, I shall decline giving my judgment on this occasion, that the party may have the judgment of this court reconsidered in another." At the close of the opinions delivered, GIBBS, C. J., said, p. 536, " as the court is equally divided, regularly no judgment can be given. If, however, the plaintiff thinks fit to avail himself of the sug-

gestion of my brother Burrough, judgment may be entered for the defendant, in order that the plaintiff, if he shall be so disposed, may carry the matter further; if he shall not be disposed so to do, no judgment at all is to be entered." *Attorney General* v. *Jefferys*, McCleland 270, was an " information of seizure." Graham, B., at the trial, " left the question of intention to the jury"; the jury found for the crown, and a verdict was taken for all the goods seized at Paddington, subject to the opinion of the court above. The court of exchequer being equally divided, Alexander, C. B., said, p. 308: " The effect of what has taken place is, that there will be no judgment upon this record." The following note is appended to the report (p. 308, note *a*)—" In this case, the court being equally divided, the effect of which was that there was no judgment, and things were, to remain as they were, the Lords of the Treasury, on petition, ordered the property seized to be restored to the defendant." In other words, the goods seized were not restored until the plaintiffs virtually gave up the litigation.

These decisions are in conformity to the early English practice. It was assumed that, in case of equal division, no judgment could be rendered. The embarrassment arising from this cause was attempted to be guarded against by the statute of 14 Edw. 3d (see Co. Litt. 72, *a*; Comyn's Digest, " Courts, D. 5 "), but the remedy there provided became obsolete (see Pratt, C. J., in *Thornby* v. *Fleetwood*, 1 Strange 368, 383), and James 1st added a fifth judge to the King's Bench and the Common Pleas, to prevent the " impediment" to the " execution and expedition of justice" arising from an equal division of the court— preface to 4 Coke's Reports 17; see the opinion of " the two Chief Justices," in Sir Stephen Proctor's case, 12 Coke 118.

In the U. S. Circuit Court, if the court are equally divided upon a hearing in equity, it is said to be the common course to dismiss the bill, without costs to either party—see Story, J., in *Veazie* v. *Williams*, 3 Story 632; but it would seem that the decree of dismissal is entered " so that the parties aggrieved may, if they think proper, bring up the question" to the Supreme Court, " on appeal for review from the final decree;" see Nelson, J., in *Silliman* v. *Hudson River Bridge Co.*, 1 Black (U. S.) 582, p. 585. In the Supreme Court of Ohio, upon an equal division, bills in chancery have been dismissed. *Waddle* v. *Bank of U. S.*, 2 Hammond 335; *Bank of U. S.* v. *Schultz*, 2 Ham. 471.

In the supreme court of Massachusetts, if a judge reserves questions of law for the consideration of the full court, and the judges are equally divided on a point which involves the plaintiff's right to recover, it is said that " judgment is commonly rendered for the defendant." Chapman, J., in *Durant* v. *Essex Co.*, 8 Allen 103, p. 107.

The result of our examination of the authorities is, that the practice in other courts has not been entirely uniform, but that the weight of precedent is opposed to the final disposition of causes in a situation analogous to the present. There is no rule of practice in this State providing for the final disposition of such causes, so long as the court remain equally divided. Perhaps such a rule may be established in some future case, where all the members of the court can take part in

framing the rule. In the present case, one third of the judges are disqualified to act. As the court are equally divided upon the question of dismissing the bill, and no agreement has yet been arrived at as to the final disposition of the cause, we are unable to see how any final decree can be made at this time, unless some way can be devised to make two a majority of four. The cause, therefore, remains pending; and the receivers, having been appointed to hold the property during the pendency of the suit, remain in possession.

(NOTE. The cause was soon after compromised by the parties.)

DOE, J. The contract which the Northern Railroad seeks to enforce in this suit, is void because of the purpose for which it was made by the former directors of the Concord Railroad, the purpose being known to the Northern, and the contract being disowned by the Concord. The purpose was, to anticipate, and practically defeat, the election of the present directors of the Concord, at the annual meeting then near at hand, if the present board should be chosen. The purpose was, by substantially transferring the management of the Concord, for five years, to the Northern, to prevent the management from going into the hands of their own successors, if the present board should be chosen. This probably was not the only object of the contract; but it was the controlling object,—the object without which the contract would not have been made as it was made. Without this purpose, the contract would have been delayed, and proposed to the stockholders at the annual meeting, or have been made subject to their ratification. For although by the form of the contract, the Northern guaranteed to the Concord, the preservation of its property, and the highest legal dividends, and although it might be presumed, under ordinary circumstances, that the stockholders of the Concord would gladly accept a guaranty so advantageous to them, still such a comprehensive contract as this, would generally, in New Hampshire, be submitted to the stockholders.

The former board may have feared that, if the present board should be elected, the interests of the corporation would suffer in their hands. The court, by a unanimous order, retaining a part of the property of the corporation in the hands of a receiver, have now decided that there were good grounds for such a fear. But such a well-grounded fear could not authorize the former board to make this contract. The danger could be averted by proceedings at law instituted by parties whose rights were imperilled; but it was not in the power of the former board, by this contract, to shield the corporation or any of its stockholders from the consequences of the action of the majority in the election of directors. The order now made, may seem to vindicate the motives of the former board; but the law does not uphold every contract that is morally and financially sound. There are many classes of transactions which might sometimes be proper and expedient, but which, if tolerated, would so often be improper and inexpedient, that, for various reasons, it is best that they should be wholly suppressed. If contracts

made by agents, officers, directors, administrators, guardians, and other trustees, for the purpose of preventing the exercise of the fiduciary power by their successors, were enforced, when judiciously made, they would so often be made under false pretences of prudence that business of a fiduciary character would be liable to great embarrassments.

In contemplation of law, a contract made by an agent or trustee to defeat the fiduciary succession, cannot be necessary for the protection of legal rights. If a breach of trust is apprehended in the succession, the law furnishes remedies which it regards as ample, such as those now in operation in this case,—a receivership and an injunction.

And the reason of the law is much deeper than these considerations of expediency and convenience. When an agent makes a contract because he believes the subject-matter of it will be mismanaged if his agency is revoked and another agent appointed in his place, this object, known to the other contracting party, renders the contract void if the principal rejects it, for the reason that the agent is not authorized to make the contract for that purpose, and the other party, being aware of the purpose, is aware of the want of authority. It is no part of an agent's authority to protect the interests of his principal by forestalling and nullifying the action of the principal in transferring that authority to another person. The former board were agents elected for one year. They were not empowered to veto the transfer of their annual power to their successors, or to veto the election of their successors, or, by any method designed for the purpose, to practically destroy the corporate electoral power, or to suspend or postpone the exercise of it an hundred years or five years. The office conferred upon them by the electoral power, did not include an authority to resist and frustrate the power that gave them official life. It cannot be presumed that the creative faculty intended to create agents for its own overthrow, or that the legislature intended to expose the elective franchise of the stockholders to a constant risk of involuntary self-destruction.

The same principle would apply if a board of selectmen or overseers of the poor should make a contract for the purpose of throwing the subject-matter of it beyond the reach of their successors, the purpose being known to the other party in the contract; or if an application were made to remove an administrator or guardian, and to appoint another in his place, and he, being notified of a hearing on the application, should thereupon make a contract for a similar purpose known to the other party. Whether the result, in this or any case, would be different if the purpose were not known to the other party, it is not necessary now to inquire.

The contract, for this reason, being at least voidable when made, and being rescinded by the defendants, is absolutely void. It could not be made valid by the railroad commissioners, and the governor and council, under Gen. St. ch. 150, sec. 10, or by the legislature, under Gen. St. ch. 145, sec. 2. A void contract is not a contract in a legal sense. There was no contract to be " sanctioned in writing by the railroad commissioners," " approved by the governor and council," or " authorized by the legislature." And there was no power in the State,

capable of making, for these parties, a contract which they had not made for themselves.

The property of the Concord Railroad has been taken from the Northern Railroad and placed in the legal custody of receivers by order of the court, and it ought not to be returned to the Northern Railroad. Whether it should remain any longer in the hands of receivers, or pass immediately into the possession of the directors of the Concord Railroad, is a question raised and argued in the case *Fisher & a.* v. *Concord Railroad & a.*

SARGENT, J. Upon the first point I agree with Judges SMITH and DOE, who have delivered opinions in the case, that the contract between the Concord Railroad and the Northern Railroad is void. I have never been able to see, since this bill was first considered, how by any possibility a contract like this could be considered valid to bind the successors of the board which made it, when it was so plainly made with the intent and for the purpose, on the part of the old board, of preventing the new board from taking possession of the road, and exercising those powers and performing those duties which, as directors of the road, it was incumbent upon them to exercise and perform,—the other contracting party having full knowledge of such purpose and intent.

Such a transaction is clearly fraudulent as against the new board of directors of the Concord Railroad. But the evidence in this case shows, we think conclusively, that had it not been for such purpose and intent on the part of the old board of the Concord Railroad, this contract would never have been made; of all which the other contracting party had full knowledge. I concur fully, then, with those who have preceded me, in finding this contract void; that the Northern Railroad has no right or power under that contract to the control of the Concord Railroad.

Such an arrangement was not only fraudulent as against the new board of directors, but also as against the stockholders in the Concord road, because by it their acts, in electing a new board of directors and putting them in charge of their road, were to be nullified and avoided, and prevented from having any force or effect whatever. Such was the design and purpose of the old board in making this contract; and the evidence shows that the officers of the Northern Road were fully cognizant of such purpose and design. If then it is an elementary principle in law, as it has long been supposed to be, that fraud vitiates all contracts as against those parties who are attempted and intended to be defrauded thereby, then it follows that neither the new board of directors nor the stockholders in the Concord Railroad are in any way bound by the contract under consideration. Twine's case, 3 Coke 80, S. C. 1 Smith's L. C. 29–60, and English and American cases cited; *Robinson* v. *Holt*, 39 N. H. 557, 562, and N. H. cases cited; *Leach* v. *Tilton*, 40 N. H. 473; *Coolidge* v. *Melvin*, 42 N. H. 510; *Pomeroy* v. *Bailey*, 43 N. H. 118; *True* v. *Congdon*, 44 N. H. 48; *Page* v. *Jewett*, 46 N. H. 441.

Nor have any rights been waived or lost, by acquiescence or ratification, on the part of these defendants or the stockholders in the Concord Railroad, but they have objected and protested against this contract upon all proper occasions and in all proper ways.

During the pendency of this litigation the Concord road has been placed in the hands of receivers.

We are all of opinion, that when a suit is pending involving the right to the possession of a railroad, this court may, even in the absence of any application to that effect on behalf of stockholders or of the State, place the railroad in the hands of a receiver, if that course is necessary to prevent serious injury to the public or to *bona fide* stockholders. But this is an extraordinary remedy, to be applied only as a last resort, and not except where urgent necessity demands. A court of equity is not a tribunal well adapted to the management of a railroad, nor is a receivership an arrangement which can be well continued for any great length of time. The officers chosen by the stockholders are ordinarily the proper managers of the corporation, and nothing but imminent peril to the State or to the stockholders can justify any interference with their control.

And when it is settled and decided by a majority of the court that the contract which we are asked in this case to construe as valid and binding is void, the question then arises whether the road shall remain in the hands of the receivers, or whether it shall go into the hands of those who are set forth in this bill as directors, who are treated and considered and styled as such, and who were declared to be elected to that position at the annual meeting of the Concord Railroad. Upon that point my conclusion is that the contract being held by a majority of the court to be void, the road should thereupon pass into the hands of the new board if they have been legally elected, and are not shown to be otherwise disqualified to execute that trust.

As to the legality of their election, I cannot conceive there is really any question. That there were some irregularities in voting upon stock, that there may have been some stock purchased with money improperly obtained, may not be worth while here to consider. Admitting it to be so for the sake of the argument, however it may be in fact; taking all that out, and making all deductions that any one can properly ask, I do not understand that it is really questioned here, or can be questioned, that the new board were elected fairly and legally, by a large majority of the stock which was properly and legally represented at that meeting. Upon this point we all agree.

They being legally elected directors, the next question is, whether there is anything developed in the present investigation which should prevent their receiving the property which they were elected to receive, and over which they were elected to take charge and have control.

It is objected that some of the stock which was used to elect the new board was purchased with funds borrowed from corporations in which the borrowers were officers, and that the loans were thus in fact obtained by a breach of trust.

To this it may be answered, in the absence of complaint on the part

of the *cestui que trusts* in those corporations, the stock purchased with funds so borrowed from those corporations is the stock of the parties who voted on it.

The security given to the banks for the money loaned was in every case ample and satisfactory. There can be no question but the same amount of money could have been obtained in Boston or New York, or almost anywhere else where money was to be had at all, upon the same security. I do not understand by the evidence here, that there was any intention on the part of anybody either to defraud any savings bank or other bank, or to use the funds of such banks without first giving to the bank satisfactory and sufficient security. That was all that the banks need to trouble themselves about—all they ever have troubled themselves about. It does not appear here but that in every bank from which the money was obtained, the stockholders and depositors are entirely satisfied with the security; and it strikes me that that should be the end of our inquiry about the interests of the savings banks. Nobody having any interest has complained that the money has been improperly loaned by those banks to this new board, so far as I have learned; and there is nobody who complains that the security for all the money loaned was not ample and sufficient.

In regard to the matter of the Clough suit, we have made an order which, as I understand it, makes ample provision against any uncertainty there may have been upon the evidence before us as to the intention of the new board, or whether there was a possibility that they might, upon the evidence, have made an improper application of their power, or an improper settlement of the Clough suit and the other conductor suits. However we may regard the evidence upon that point, it is at least proper that everything should be done, which can be required, to make the matter entirely safe, and guard against any possibility of wrong to any stockholder of the Concord road. With that view the order was made in reference to the Clough suit, so that nothing is now to be feared in regard to that, or any of the other conductor suits, by any stockholder in the road.

But it is asked with great assurance, " If the new board cannot be trusted with the trifling amount of the Clough execution, shall they be trusted with the whole interest of this great corporation, amounting perhaps to millions ? "

It does not occur to me that in this case there is any ground for proposing such a question, or that the course of reasoning which it implies has any application here.

To illustrate the case: If a juryman should come in here to sit upon a case, and was in any way related to either of the parties, the law would hold him incompetent, and would not allow him to sit, no matter whether the amount in controversy was one dollar, or a hundred, or a thousand; but in all other cases, where he does not stand in peculiar relations to the party on trial, he is entirely competent;—so if he had any interest in the result of the cause, the peculiar relations in which he stands to one of the parties, or his interest in the case, should disqualify him from sitting in that case, no matter whether his interest

be one dollar, or a hundred, or a thousand ; but that does not disqualify him from acting in all other matters where he has not that relationship or interest.

So if it should be found that the judge who holds the term is in any way related to either party in a cause, or if he had any interest in the result of any suit between the litigants in his court, he would be disqualified to act in all such suits ; but that would not disqualify him from acting in all cases where he was not thus related to either party and was not interested in the result of the suit.

Now, if any relationship or interest existed here on account of any contract or agreement between Clough and any member of the new board, so far as that is concerned the action of the court has placed it beyond the danger of harm or injury to anybody ; and beyond the Clough suit and the other conductor suits, I do not find there is any cause to fear, or any reason to apprehend, that these men who have been elected members of this new board, and are known to us as gentlemen of respectability and character, will not do their full duty. I do not understand, upon the evidence before us, that there is really to be apprehended any danger that they will so far forget their duty, so far forget their own interest, so far fail to look out for themselves as stockholders, as to fail to do their duty in regard to all others who are, in like circumstances, stockholders in the corporation.

I am not satisfied, upon the evidence, that there is any danger to be apprehended from having the new board take possession of the road ; and I therefore agree with Judge SMITH in the conclusion to which he has come, that, the contract being void, the receivers should be discharged, and this bill should be dismissed.

It is usual, when suits are brought in this court, and it is found and decided that the plaintiff has no case and no standing in court, that the defendant has nothing to do or answer for because there is no party in court that has any right to require him to do or answer for anything whatever, to allow the defendant to go out of court with a judgment for his costs against the plaintiff. And since in this case three of the four members of the bench who can sit at this hearing have decided affirmatively that the contract between these roads is void, and that the plaintiff has no case and no standing in court, it seems to me that the only proper course is to dismiss all proceedings, and allow the Concord Railroad to pass at once into the hands of those who own it and ought to have the legal right to control it.

But while this seems to me the only proper course to take in the premises, yet so long as two members of the court differ in opinion upon that point from the other two, the result must be that no order can be made, and that the case must remain in its present condition.

Entertaining these views, it becomes unnecessary to consider the important question, so ably discussed by eminent counsel, of the power of the directors to make such a contract as the one in question, provided they acted in good faith and without any improper motives ; and also the further question, whether, if such a contract might properly be made in any case, it has in this case received the proper sanc-

tion and approval of the proper State authorities to make it binding under the statutes.    Upon these questions I express no opinion.

BELLOWS, C. J.    On this application to dissolve the injunction restraining the use of force by defendants to obtain possession of the Concord Railroad and its incidents, the question is whether it is made to appear to the court so clearly that the plaintiff has no title, as to justify the dissolution of the injunction before its final hearing.

The principle that ought to govern the court, I think, is this : that until the court is prepared to restrain the plaintiff from the use of force to resist the attempt of the defendants to take possession, the injunction against the use of force by defendants ought to stand ; and before such an injunction should issue against the plaintiff, the title of the defendants should appear so clearly as to warrant a final decree against the plaintiff.  Or, in other words, the dissolution of this injunction should be, and would be, equivalent, in effect, to a final decree against the plaintiff.

The first question is, whether these corporations had the power to make such a contract as was here made, and if so, whether that power has been legally executed.    And, first, as to the power.    A question much discussed at the bar, and upon which great stress was placed, is, whether the two corporations had power to make such a contract without the direct assent of the legislature, it being contended by the plaintiff that the case came within the provisions of section 10 of ch. 150 of the Gen. Statutes ; while defendants contended that it must be governed by sec. 2, ch. 145, of those statutes.    It may be conceded, in general terms, that a contract for the use of one railroad by another,— that is, for the entire use and working of it,—cannot be made without the assent of the legislature, or something equivalent to it; and this, we think, is clearly the policy of our legislation.

But it by no means follows that this assent is to be specially given in every case, for we apprehend that the legislature can, by general laws, authorize railroad corporations to make contracts involving some use of each others' roads without any special assent of the legislature, or with the sanction of the governor and council and railroad commissioners, as a substitute for the assent of the legislature.

And the real question in this branch of the case is, whether the legislature, by such general law, has authorized such a contract as was made here.

Section 10 of chapter 150 of the Gen. St. provides that " no contract between two or more railroad corporations for the use of their roads shall be legal or binding for a longer time than five years, nor unless sanctioned in writing by the railroad commissioners, and approved by the governor and council."

This prohibition of this class of contracts without the sanctions provided for, carries with it by implication a right to make such contracts with those sanctions.    *Concord Railroad* v. *Greeley*, 17 N. H. 54.

It will be assumed, then, that the legislature has authorized this class of contracts, if sanctioned in the manner required, and in such

case the contract is as valid and binding as if specially authorized by the legislature.

The question then is, What class of contracts did the legislature intend to embrace and provide for in this section ?

Of course in determining this question we are to take into consideration other legislation *in pari materia*, and such acts are to be taken together as one law.    *Sloan* v. *Bryant,* 28 N. H. 67 ; *Hayes* v. *Hanson,* 12 N. H. 290.

We are also, in case of doubt, to take into consideration the previous legislation upon the subject, and the policy established by it, so far as it may bear upon this question.

In sec. 2 of ch. 145 of the Gen. St., we find provisions which in *terms* are in direct conflict with sec. 10 of ch. 150.    Sec. 2 provides that " no sale, lease, mortgage, or contract, for the use of any railroad, shall be valid, unless it shall be in writing, filed in the office of the secretary of state, and authorized by the legislature."    In both of the sections we find a prohibition of contracts for the use of a railroad, unless sanctioned in the one case by the legislature, and in the other by the governor and council and railroad commissioners.

By well settled rules of construction, the court should endeavor to harmonize these provisions so as to give effect to both, and if that cannot be done, to endeavor to ascertain the intention of the legislature, and to give effect to it.

Upon this subject two totally different views are presented by counsel : one is, that the terms " contract for the use of their roads," in sec. 10, are confined to the regulation of the ordinary connections between railroads in the transportation of the passengers and freight of one over the road of another, and do not extend to the entire use and working of one road by another for any space of time ; that this is indicated by the title of the chapter " Railroad Connections ; " and that, with this construction, these terms in both sections would take effect.

On the other hand, there is great force in the suggestion that the terms of this section 10, as originally reported by the revising committee, very clearly related to this sort of connection, suggested by the defendants' counsel, but that the legislature amended the section by striking out those restrictive terms and restoring the terms of the act of 1850, which were clearly broad enough to embrace all contracts for the use of a railroad, whether for the entire or partial use.

As originally reported, the contracts requiring the sanctions of that section were "*for the transportation of freight and passengers, or in relation to conducting the business of their road.*"    This was struck out, and the words " between two or more railroad corporations, for the use of their roads, shall be legal " inserted.

If these terms, limiting the word contract so as to mean what is now contended for by defendants' counsel, were struck out, and terms broad enough to embrace all contracts for the use of a railroad inserted and passed, it would be strong evidence that the term contract was not used in this restricted sense.    In *Rich* v. *Flanders,* 39 N. H. 304,

it was *held* that the intention of the legislature, that a law should apply to pending suits, was very clearly expressed by repealing a provision in a former law that it should not so apply. For a similar but stronger reason, the intention of the legislature that the term contract should not be so restricted, may be gathered from this amendment.

It is to be observed, also, that this construction, contended for by the defendants, is inconsistent with the previous sections of chapter 150. Those sections clearly relate to railroad connections in the restricted sense used by defendants' counsel. They provide that one railroad shall draw over its road the cars, passengers, and freight that may be brought to it by another railroad, having a right to enter upon and use it, or to enter upon and use a connecting road ; but shall not be required to allow its road to be used by any but its own motive power ; and then it provides, that if the parties cannot agree upon the terms of such service, the supreme court, or two justices thereof, may appoint referees to determine the same, and they shall fix the rates and terms for the future, and their award shall be valid and binding, until altered by the parties or the legislature, or a new decision by referees.

In these provisions there is nothing that indicates any necessity of action by the governor and council or railroad commissioners. On the contrary, the power to adjust the terms of this connection by the simple agreement of parties is very clearly contemplated ; and it is even provided that the award of the referees may be altered in the same way,—that is, by the agreement of parties.

It is believed, also, that the practical construction given to the law of 1855, of which the sections of chapter 150 preceding sec. 10 are but a revision without substantial change, has been in accordance with these views, and that the sanction of the governor and council and railroad commissioners has not been obtained to contracts adjusting the terms of such connections. Neither is there anything in the nature of the service required, namely, the drawing over its line of the cars and passengers and freight of another railroad, that would make it reasonable to suppose that such a sanction to a contract respecting it would be deemed necessary, especially when we consider that the legislature has entrusted to the various boards of directors the duty of fixing the tolls for their respective roads.

A construction, then, of sec. 10, such as is urged by defendants' counsel, would not only be inconsistent with its terms, which indicate no such restricted meaning, but totally inconsistent with the previous sections of the same chapter, with the obvious intention of the legislature in making the amendment alluded to, and with the practical construction given to the act from which it was taken.

The defendants' construction would indeed make section 10 operate as a repeal of all the previous sections of the same chapter, except the two first,—a proposition which is wholly inadmissible. As has been before remarked, this section 10 was taken from the law of July 13th, 1850, ch. 953, sec. 8, which provided that " no contract between two or more railroad corporations, for the use of their roads, shall be legal or binding on either party, unless such contract shall be sanctioned, in

writing, by the railroad commissioners, and approved by the governor and council, and in no case shall such contract be for a longer term than five years; and no such use of another road shall be allowed, unless by contract, in writing, executed by both parties, and a copy filed with the secretary of state."

The chapter in which this is found is an amendment of the law in relation to railroad corporations, and has nothing to do with the connections of railroads in the restricted sense alluded to. The terms are certainly broad enough to include any contract for the use of one railroad by another, and the requirements are certainly more elaborate than would be looked for in an agreement to fix the terms of such a service as drawing the cars of another road over its line.

On the other hand, the occasions were numerous where the interests of the public would be promoted by a contract which would enable a strong road to equip and operate a weak one for a short time, receiving a certain compensation for the service on paying to the other, out of the avails, a sum agreed upon.

Such contracts have often been made, as with the Cochecho, Great Falls & Conway, Portsmouth & Concord, Manchester & North Weare, Manchester & Lawrence, Wilton, Concord & Claremont, Contoocook Valley, Sullivan, Ashuelot, and White Mountains railroads.

In many of these instances it was for the interest of the public and the stockholders of both roads that such a contract should be made; and it would not be unreasonable to suppose that the legislature, when it used terms clearly broad enough for that purpose, intended to give such railroads power to enter into such contracts for a short period not exceeding five years, provided they were sanctioned by the railroad commissioners and the governor and council.

This law of 1850 was substantially reënacted in this sec. 10, chap. 150, and should have the same construction, especially as the amendment before stated evinced the intention to adhere to the provisions of this law of 1850; and the fact that it is included in the chapter relating to railroad connections, cannot affect its construction, under the circumstances disclosed. When that section was placed there by the committee of revision, it was so changed as to make that the appropriate place; and when amended so as to alter its character entirely, it was still allowed to retain its place in that chapter.

As bearing upon the construction to be given to the law of 1850, and section 10, chap. 150, of the General Statutes, it should be borne in mind that neither in the law of 1851 or 1855, relating to the connections of railroads, was there any provision requiring the sanction of the governor and council or the railroad commissioners to the agreements regulating those connections. Those acts clearly relate to the drawing by one railroad over its line the cars, &c., of another, and, in fact, provide for it; and the mode of adjusting the terms for that service was, by agreement of the parties, by referees, or by the legislature. As, therefore, under these acts the terms of these railroad connections could be adjusted by agreement of the parties simply, without any sanction or approval by the governor and council or railroad com-

missioners, and as the law of 1850 was not repealed by them, this affords strong grounds for the inference that the law of 1850 was not understood to cover the same ground; and as chapter 150 of the General Statutes is substantially a revision of the law of 1850, with the addition of section 10, the argument is very strong that section 10 was not understood to relate to the ordinary railroad connections.

As bearing upon the construction to be given to sec. 8 of the law of 1850, it will be seen by the House Journal of that year, page 465, that, while the bill was pending, Mr. Quincy moved to strike out the entire section, and insert instead, that " No railroad shall take a lease or hire the use of any other railroad, except specially authorized thereto by the legislature, and all such contracts made without such assent shall be null and void." Upon this amendment the yeas and nays were called, and it was rejected by a vote of 188 to 40, showing conclusively the intention of the house to give the right to contract for the use of a railroad for the term of five years without the special assent of the legislature.

It is certain that from 1851 to 1867 these connections might be adjusted by the agreement of the parties, without any other sanction whatever, and we see no evidence of any intention to change the law in this respect. The committee certainly reported such a change, but it was explicitly rejected by the legislature, and the law restored to the footing upon which it had stood for many years.

Sec. 2 of chap. 145 of the Gen. Statutes is undoubtedly broad enough in its terms to embrace all cases of contracts for the use of a railroad, and so far as those terms are concerned might as well include the ordinary railroad connections as the same terms in sec. 10, chap. 150. This is not, however, contended for by either side.

Upon a fair construction of these two sections, standing by themselves, it would seem that the same kind of contract for the use of a railroad was embraced in both; but as different sanctions are required in the two sections, we must qualify the one or the other according as we find the legislative intention. The two sections are to be construed together as if but one law; and for the reasons already assigned, we think the legislature has unmistakably manifested its intention that section 10, chap. 150, should include contracts for the use of a railroad in its broad sense, and not limited to ordinary railroad connections, and, therefore, it must qualify the provisions of sec. 2, chap. 145, so that they shall apply to contracts for the use of a railroad only when for a term of more than five years.

As bearing upon the question of legislative policy and intention, it may be proper to consider the act of June 26, 1867, chap. 8, " to prevent railroad monopolies." That act expressly forbids the consolidation of rival or competing lines of railroad, or the running one of such lines by the other, under a business contract, lease, or other arrangement, without being first authorized so to do by the legislature, and approved by the governor and council. Sec. 3 provides that the act shall apply solely to rival lines, and not to contracts or leases for the running and operation of any road constructed as an extension or

continuation of a separate and independent line, or as parts and parcels of the same, or to any side branches, tributary or secondary to such line, all which are specially exempted from the provisions of the act.

It is clear, from these provisions, that it is in accordance with the policy of our legislature that one railroad should be permitted to operate another when not a rival line. It will be seen, also, that the policy of our legislation has given a liberal construction to the powers of railroad corporations.

By chap. 142, Rev. St., sec. 10, any railroad corporation might contract with any other railroad corporation for the transportation of freight and passengers, and the conducting of all business connected therewith on their road. The law of July 5, 1851, and the Gen. St., ch. 150, providing for adjusting the terms of connection, imply the same thing.

This clearly recognizes the right to exercise the business of common carriers over lines of road beyond their own; and this is now the established doctrine in this State, that a railroad company may carry on this business not only beyond its own line, but out of the State. *Nashua Lock Co.* v. *Nashua & Worcester R. R.*, 48 N. H. 339–363; *Barter & Co.* v. *Wheeler & a.*, 49 N. H. 9–29; *Crafts & wife* v. *B. & A. Express Company*—Coös, July term, 1869. This liberal interpretation of their powers and responsibilities enables them to form such communications with other railroads as to make them answerable for the negligence and misconduct of such other railroads, by which injury is done to passengers or freight transported on joint account. If, then, two or more connecting railroads can enter into an agreement by which they may become jointly interested as common carriers of through passengers and freight over their connected lines, so as to be jointly liable for losses or injuries caused by the negligence or misconduct of either of them, it would seem to follow as a necessary incident that they might by agreement make all needful rules and regulations for the management of that business, extending even to the giving to one corporation the working of the entire line; and this would furnish another occasion for the exercise of the power to contract for the use of another railroad.

In *Shawmut Bank* v. *Plattsburgh & Montreal R. R.*, 31 Vt. 491, it being assumed that the act under which the defendant corporation was organized empowered it to contract to transport and deliver persons and freight beyond the terminus of its road, as it in fact did, it was *held* that this power carried with it the necessary and proper incidental means of exercising and enjoying it, and that the means to be used are entrusted to the direction and management of the directors; that their acts were the acts of the corporation, and that they might bind it by the purchase of a steamboat to facilitate the business beyond their own line. Much the same doctrine is recognized in *S. W. R. Co.* v. *Redmond*, 10 C. B. (N. S.) 675.

This connection between railroads, by which they form one continuous line of common carriers for through business, and all being responsible for injuries and losses, has grown out of the demands of commerce;

and the arrangements between them, though informal and without special legislative or other sanction, have been held good and valid to bind all the corporations as carriers. It is very obvious that this capacity must add very largely to the occasion for one railroad to contract with another for the use of its road, and the policy of allowing such connections seems to have been inaugurated as early as the Revised Statutes.

Taking into view, then, the history of our legislation on this subject, there is nothing in the nature of the case to render it unreasonable to suppose that the legislature intended to authorize a contract for the use of a railroad for a short period, when sanctioned by the governor and council and railroad commissioners. The most obvious objection to such a contract here, lies in the fact that the Concord Railroad is perfectly able to operate its own road. Had it been otherwise, and the Concord road had been weak and needed aid, the arrangement would have seemed well enough; and yet, as to the question of power, the condition of the roads is immaterial. The real inquiry is, whether, by a fair construction of the law, it can be seen that the legislature intended to give one railroad the power to contract with another for the use of its road for a short period without special authority of the legislature, but with the sanction of the governor and council and railroad commissioners to whom the power is delegated.

The power of the legislature to authorize a contract between two or more railroads, by which one may operate all, is not questioned.

It is very obvious that in many cases such an arrangement would be for the interest of the public, and also of the shareholders of both or all the corporations, because most economical and safe; it being apparent that the frequent shifting of motive power and cars at the end of short roads must be attended with great delay and expense, if not increase of risk; and accordingly, to avoid this and save the necessity of re-shipping the through freight, the practice has become general of running the cars containing such freight over the whole line; and in respect to that as well as through passengers, the different companies so connected are jointly interested and responsible as common carriers.

When the through business is large, as it is understood to be over the Northern and Concord roads, it is obvious that their joint interest in the transportation of passengers and merchandise is a very important part of their whole traffic; and as this may be regulated between the companies by agreement of the parties alone, it would seem not at all unreasonable that the legislature should give them the power to enter into an agreement by which one company should furnish the whole motive power, and operate both or all the roads for a short time, with the sanction of the governor and council and railroad commissioners.

In *Barter* v. *Wheeler*, before referred to, it was held, that where several railroads make a business arrangement by which a continuous line is formed, and each sells tickets over the whole line, and contracts to carry goods through the entire route, and receives the price for it in one entire sum, which is to be divided in stipulated proportions among the several lines, the several companies composing this line may be

regarded as jointly undertaking for the service, and are responsible for loss or injury upon any part of the line; and a similar doctrine was held in *Nashua Lock Co.* v. *Nashua and Worcester R. R.* In neither case was the assent of the legislature, or the governor and council or railroad commissioners, to such arrangement deemed to be necessary. The power to make such arrangement, and so to form a continuous line, is a necessary incident of the power to exercise the business of common carriers beyond the company's own line, and comes within the principle of *Shawmut Bank v. Plattsburgh & Montreal Railroad*, 31 Vermont 491, and *S. W. Railway Co.* v. *Redmond*, 10 C. B. (N. S.) 675; see, also, *Hart* v. *Renn. & Sar. R. R.*, 4 Seld. N. Y. 37, where three different companies were operated together.

As, then, the different companies may have, by agreement between themselves, a joint interest in the through traffic over their roads, it would not seem to be unreasonable that the legislature should allow them to extend such joint interest to the local traffic with which the other is closely connected for short periods, provided it be sanctioned by the governor and council and railroad commissioners.

It is urged, also, that sec. 10 is the later expression of the legislative will, and on that ground must control sec. 2 of ch. 145.

If it is to be regarded as a later act, such would ordinarily be the effect; and from the authorities cited by the plaintiff's council from Indiana, it would seem that this sec. 10 was to be regarded as a later expression of the legislative will than sec. 2 in ch. 145.

In *Ham* v. *The State*, 7 Blackford 314, it was held that a provision of their Revised Statutes was to be regarded as a later expression of the legislative will than a provision in a previous chapter, although both were passed at the same session of the general assembly. By the preceding chapter, the county treasurer was to hold his office three years from the first Monday of March next succeeding his election. In the subsequent chapter, it was three years from his election; and it was held that the latter must prevail.

Without, however, determining this question, we think that the intention of the legislature was, to authorize contracts between railroads for the use of their roads, according to the ordinary meaning of the terms, for five years, when sanctioned by the governor and council and railroad commissioners.

In this case the contracting parties are the Concord Railroad and the Northern Railroad. By the agreement, both roads with their branches and incidents are placed under the management of one agent, to be appointed and removed at any time by the Northern road, but acting for, and as the agent of, both and each of the parties, and who is to have the care, management, and operation of both roads for five years, reserving to the parties, by concurrent votes of their respective boards of directors, each board acting by itself, the same control over said management as is usual with boards of directors in ordinary cases, all the income of both roads to come into and belong to the joint management, and the agent to take charge of the same, subject to the control of the boards of directors by concurrent votes; and to avoid questions

and controversies as to the division of the net receipts and income, there is to be paid from them to the Concord road, half yearly, the sum of $75,000, and the remainder to be paid to the Northern road, which, in case of any deficiency, is to make it up to the Concord road.

The tolls now established by the Concord road are to remain, unless changed by mutual consent or by law; and in case any change is made or permitted by the Concord road without the consent of the Northern road, the amount of the deductions of income caused by such change is to be allowed towards the payments to be made the Concord road as aforesaid.

The substance of the agreement is, that the two corporations place their roads under the management of one agent appointed by the Northern road, but who is subject to the control of the two boards of directors acting separately and by concurrent votes. It is not strictly a lease, although the possession is to be in an agent, who may be appointed and removed by the Northern road, and yet he is expressly the agent of each road, and could be made responsible as such to the Concord road.

If it be a contract for the use of the Concord road, as the defendants' counsel claim it to be, or a lease, then upon the views already expressed I think the corporations had power to make it, if sanctioned by the railroad commissioners and the governor and council; and by express provisions in the charters, the directors are empowered to exercise all the powers granted to the corporations for constructing the railroad, and for transporting persons, goods, and merchandise thereon, and all other powers and authority not before granted, as may be necessary and proper to carry into effect the object of the grants.

What could be done by the corporations, could ordinarily be done, then, by the directors of those corporations; and as the law gives the corporations power to contract for the use of a railroad with the sanctions required, and as, when so done, the State must be deemed to have assented to it, the only question as to the power is, whether there is any thing in this contract which renders it invalid as to the shareholders, and if so, whether such objection can be urged in this form.

In considering this question it is to be observed, that railroads in this State are expressly declared to be public corporations, and their roads, like other highways, are public, and at all times subject to the control of the legislature. See Gen. St., ch. 146, secs. 1 and 2. In the charters both of the Concord and Northern roads, the legislature reserved the right to alter, amend, or modify the acts or any of their provisions; and from the beginning this power has been freely exercised in the enactment of laws for the regulation of those corporations.

From an examination of the authorities, I am satisfied that the shareholders would not be bound by a change in the charter which is fundamental, as by superadding a new and distinct business, or probably by authorizing the construction of an extension of its railroad. But I think it is otherwise where the act is merely auxiliary to the enterprise embraced in the original charter, and designed to facilitate its execution;

and especially is it so where the right to alter, amend, or repeal the charter is expressly reserved, as it is here.

In *Boston, Concord & Montreal Railroad* v. *The State*, 32 N. H. 215, it was held that it was no violation of vested rights to subject an existing corporation to a fine for loss of life caused by its negligence; and BELL, J., says that the privileges of a corporation could not be construed to limit the general powers of legislation, where such legislation merely regulates the existing rights and duties of corporations, or provides new modes of enforcing acknowledged obligations.

The boundary between what will and what will not bind a shareholder may not be very well defined, although the cases are very numerous on that subject. I am inclined to think, however, that an act authorizing an existing corporation to enter into a contract with a connecting road, over which it might, and did, lawfully exercise the business of a common carrier, by which it might work such connecting road, or become jointly interested in the working of it, would be regarded as merely auxiliary to the business then lawfully conducted, and would bind the shareholders. The cases of *Shawmut Bank* v. *Plattsburgh & Montreal Railroad*, 31 Vt. 491, and *S. W. R. Co.* v. *Redmond*, 10 C. B. (N. S.) 675, are certainly very strong authorities in that direction—holding, as they do, that such power is incidental to the right to carry on the business of a carrier beyond its own line.

In the latter case, the plaintiff, a railroad corporation, and having a branch of its road terminating at Milford Haven, entered into a contract with defendant by which he engaged to run a steamboat between that port and ports in Ireland, in connection with plaintiff's railway, for the transportation of goods and passengers: it was held that such a contract was not *ultra vires*, but designed to facilitate the working of the railway, and that a suit might therefore be maintained against the defendant for breach of his contract, ERLE, C. J., holding that it was in the contemplation of the legislature that this railway terminating at Milford Haven should forward traffic to and from Ireland.

These views are designed to go no further than this,—that a contract entered into by the directors of two railroads, in good faith, to facilitate the conducting of business which they are lawfully doing, and in which they have a joint interest, the contract being sanctioned by the governor and council and the railroad commissioners, is not necessarily invalid because it embraces the use of one road for a period not exceeding five years.

It may be invalid for other reasons, as that it was entered into in bad faith, and not to promote the interests of the corporations; that it was designed to effect a fundamental change in the business of the corporation; or was subversive of its very object, as by putting an end to its existence, and the like.

On this point the case of *Vandall & al.* v. *South Francisco Dock Co.* is reported in Am. Law Register, August, 1871, 506. In that, the Dock Co. was formed to "buy, *improve*, lease, sell, and otherwise dispose of, real estate," and it entered into a contract with a railroad company, which was about building a railroad into the vicinity of lands pur-

chased by defendants, for some increase in the width of the road, and a greater number of trips, for which defendants agreed to pay $20,000. It was *held* that they might lawfully make such a contract to give increased facilities to those lands.

The question then arises whether this power has been properly executed,—and first, as to the approval by the governor and council.

It is urged that the approval of the governor and council was invalid and of no effect, for the reason that the governor, being a stockholder in the Northern road, was interested, and could not act.

It was very clear that a man shall not be judge in his own case, although there are cases where it is held that a judge who is interested theoretically, may, *ex necessitate*, sit in the cause; as, when jurisdiction is given to his court alone, and the city, or town, or county in which he lives would be entitled to the penalty which is the subject of the action or indictment. *Commonwealth* v. *Worcester*, 3 Pick. 462; *Hill* v. *Wells*, 6. Pick. 104.

In the case of *Moses* v. *Julian*, 45 N. H. 52, the court does not assent to such a proposition, holding that the power resulting from necessity can extend no further than the case requires, such as to order a continuance, transfer the cause to another tribunal, and the like,—but holds that it can never be necessary for a judge, who is disqualified to decide, to assume to determine a case which the law presumes he may probably decide wrong.

In that case, by declining to sit, it was held that an appeal might be taken, and the case carried to the supreme court. A case where no other court could have jurisdiction was not considered.

However this may be, I am of the opinion that the act of approval in the case before us was not judicial in its nature, but was rather of the same nature as the approval of bills passed by the two houses, which is governed by views of public policy; and such bills have always been approved by the governor, although he may have had a personal interest in them; and so in England, the royal assent is given to bills providing for the dignity and honor of the crown. · See Cushing's Pr. of Leg. Assemblies, § 2365.

The approval of laws, and of these contracts, is required in substantially the same terms, and for aught I can see are acts of the same nature involving questions of public policy.

Had the two branches of the general court ratified and assented to this contract, the governor would have been called upon for his approval,—and I apprehend its validity could not have been questioned on account of his interest; and yet his act would have been of the same nature precisely as the direct approval of the contract.

The sanction of the railroad commissioners and the approval of the governor and council were to take the place of the assent of the legislature; and there is no difference in the nature of the acts: neither of them was judicial.

So it will be observed that the act could be done only by the governor. No provision is made for a substitute, thus presenting a strong case of necessity.

In this case there was no determination of the rights of parties, either of law or fact; no decision of any questions peculiar to judicial tribunals; but the question before the governor and council was, substantially, whether it was consistent with sound public policy that the assent of the State should be given to this contract—precisely the same question that was before the legislature when its assent was asked for.

This question of policy undoubtedly involved an exercise of discretion and judgment, but it was in its nature the same that is involved in the approval of bills, or in their passage, and is in no sense judicial.* The 35th art. of the bill of rights recognizes the importance of an impartial interpretation of the laws and administration of justice, and declares that it is the right of every citizen to be tried by judges as impartial as the lot of humanity will admit; but no such provision exists as to officers not judicial.

There is nothing then in the constitution that prohibits the action of the governor in a case like this, neither is there any such prohibition in the statutes.

In respect to some ministerial officers, as sheriffs and their deputies for instance, they are disqualified in some cases, by statute, by reason of interest, so that a sheriff cannot serve process where he is himself a party, nor can he return talesmen in a cause where he is interested, or related to either party. *Barker* v. *Remick*, 43 N. H. 237, but it does not appear that at common law he could not serve his own writ.

In other cases, upon principles of the common law, a person could not act, as in the case of a juror or witness. The functions of a juror were, however, judicial in their nature, and yet, notwithstanding his minute interest as an inhabitant of the State interested in a public prosecution, or of the county entitled to the fine sought to be imposed, the juror might sit; otherwise there would be a failure of justice. And so it is in respect to judges themselves in criminal causes, where a fine might be imposed for the benefit of the county in which they reside.

In respect to the assent of the governor to bills passed by the two houses, it is required by the constitution, unless they are passed over his veto by a two-thirds vote of each branch, or the governor shall fail to return them in five days after they are presented to him: and there is no provision, either in the constitution or laws, for any substitute in case the governor is interested; and, therefore, *ex necessitate*, he may act; and as the bill has been sanctioned by both branches, it might well be deemed safe to hold it to be a law, notwithstanding the interest of the governor.

The same argument *ex necessitate* applies here. The act of the governor is substantially the same as in the other case, and the assent of the council has been given.

It is obvious that there is a broad line of distinction between acts which are judicial and those which are purely ministerial, in respect to the effect of interest as a disqualification; and, accordingly, on that

---

* See petition of commissioners of Strafford county, *post.* REPORTER.

ground, it has been held that the extent of an execution upon land is valid, although the oath to the appraisers was administered by the creditor. *Atherton* v. *Jones*, 1 N. H. 363. This was put upon the ground, by WOODBURY, J., that the act was ministerial. It has also been holden, I think, in this State, that the grantee in a deed may take the acknowledgment of the grantor.

So it has been held that an acknowledgment of a deed, taken by a justice of the peace of Strafford county, but in the State of Maine, was valid, being a ministerial act. *Odiorne* v. *Mason*, 9 N. H. 24.

I do not suppose, however, that upon the principles of the common law an officer, not judicial, may in all cases act where he is interested. On the contrary, when his action requires the exercise of judgment and discretion, and the act can be done by another, I think, as a general rule, he cannot act; but if the law provides for the doing of an act by a particular officer, and no provision is made in case he is interested for its being done by another, and there is no prohibition in such case as there is in respect to a man being judge in his own case, then, I think, he may act.

It has been so held, even where the act was judicial, but the interest so minute that the legislature might disregard it, as in the cases cited from Massachusetts. Much more would it be so where the acts to be performed are not judicial, as in this case.

The case of *Phillips* v. *Eyre*, Law Reports, 4 Queen's Bench 225, is very much in point. It was an action for assault, false imprisonment, and taking and carrying away goods, alleged to be done in the island of Jamaica. The defendant pleaded an act of indemnity, passed by the governor, legislative council, and assembly of Jamaica, and approved by the queen. The plaintiff replied, that the defendant was then the governor of Jamaica, and was himself a necessary party to the passage of the act, and that the act could not have become a law without his assent as governor. To this replication the defendant demurred, and the demurrer was sustained. For the plaintiff it was argued that the defendant was legislating in his own behalf, and that he could not, by his own act, free himself from his liability. In the opinion of the court, by COCKBURN, C. J., he says, we have no hesitation in pronouncing the replication to be bad; that there is no ground whatever for saying that the governor of a colony cannot give his official consent to a legislative measure in which he may be individually interested. It might as well be said that the sovereign of these realms could not give assent to a bill in parliament in which the sovereign was personally concerned. A writ of error having been brought, the decision of the Queen's Bench was affirmed in the Exchequer Chamber, June 23, 1870, reported Law Reports, 6 Queen's Bench 1.

On this point, WILLES, J., said, the objection is founded upon a supposed analogy between legislative and judicial proceedings. In the latter the judgment of the interested judge is voidable, and liable to be set aside by prohibition, error, or appeal, as the case may be: but it is not absolutely void; and persons acting under the authority of

such a judgment, before it is set aside by competent authority, would not be liable to be treated as trespassers. This was the opinion of the judges acted upon by the House of Lords, in *Dimes* v. *Grand Junction Canal Co.*, 3 H. L. C. 759–786 ; and in case of necessity, as where all the judges of a court having exclusive jurisdiction over a subject matter happen to be interested, the objection cannot prevail.

The supposed analogy between judicial and legislative proceedings is, moreover, imperfect. The governor is no more a party in the colonial act than the legislative council or house of assembly, or, in legal theory, every inhabitant of the island represented therein. If the objection were just in the case of the governor, then, by like reasoning, the crown could claim no benefit from any act of parliament ; a result alike contrary to experience and reason.

The remaining question is, whether the sanction of the railroad commissioners was duly obtained.

As the case stands before us, it appears that there were three railroad commissioners, and that two only sanctioned the contract, and that the other neither met with his associates, nor was notified to do so.

This raises the simple question, whether, in the case of railroad commissioners, two of three could perform this act without any participation of the other, or notice to him.

It is claimed by the plaintiff, that under sec. 14 of ch. 1 of the Gen. St., any two of the railroad commissioners may execute this duty. That section provides that " words purporting to give a joint authority to three or more public officers, shall give such authority to a majority of them, unless otherwise expressly declared." This is a substantial reënactment of sec. 13 of ch. 1 of the Rev. St.

By law of Feb. 8, 1791, N. H. Laws, ed. 1815, p. 247, a similar provision is made in respect to selectmen, viz., that " in all cases where anything in law is enjoined upon, or to be done by, the selectmen of any town or place, it shall be sufficient if done by the major part of such said selectmen ;" and this provision is reënacted in the laws of June 28, 1827, N. H. Laws, ed. 1829, p. 453–4.

The construction of this law has been settled in accordance with the obvious import of the language, in sundry decided cases : *Andover* v. *Grafton*, 7 N. H. 304, where it was laid down by PARKER, J., that a note given for a town, and signed by a majority of the selectmen, would bind the town.

In *Edgerly* v. *Emerson*, 23 N. H. 555–569, it was held that where, in a bank charter, the directors or any four of them are empowered to act, the action of that number would be valid whether the others were notified or not ; and the court, by BELL, J., say, under the statute a major part of the board of selectmen could act, in the absence and without notice to the rest ; and that it was the object of the statute to give this power.

So is *Butler* v. *Washburn*, 25 N. H. 256, in respect to selectmen. In *Hall* v. *Manchester*, 39 N. H. 301, it was decided that the laying out a highway by two of the three selectmen was valid under our statute, although it did not appear that the other was present or acted. It was

put upon the ground that by the statute a majority of the selectmen could act in all cases ; at the same time it was held that the act of laying out the highway was of a judicial and of a public nature.

A similar construction has been given to laws providing for the approval of official bonds by the justices of the Court of Common Pleas, or the Superior Court, as in the case of sheriffs. Revised Statutes, chap. 178, § 1. In such cases the practical construction has been that a majority of the justices might approve the bonds, and without meeting for that purpose ; and now, by the Gen. Stat., chap. 198, sec. 2, it is expressly provided that the bonds of sheriffs shall be approved by a majority of the justices, but it has never been supposed that all or any should meet for that purpose. In the case of road commissioners or county commissioners, when laying out highways, it is settled that the board must be full to entitle them to act. It was so decided in *Palmer* v. *Conway*, 22 N. H. 144 ; but at the same time it was left undecided whether in case the board was full two could act without a meeting with or notice to the other.

The conclusion that the board must be full was undoubtedly reached upon the ground that such an intention was supposed to be manifested by the legislatures, through the several provisions for filling any vacancy that might happen, even to allowing two to appoint some suitable person when the other fails to attend. These various provisions are cited by the court in *Palmer* v. *Conway*, as indicating the purpose of the legislature that the board should be full. A similar doctrine is held in *Mitchell* v. *Holderness*, 34 N. H. 213, and more recently in *Wentworth* v. *Farmington*, 49 N. H. 119.

In the *Petition of Nashua*, 12 N. H. 425, decided in 1841, and before the provision in question in the Revised Statutes giving a majority power to act, it was held that the case must be heard and considered by all, and that all the members must be competent to act.

So it was laid down that where several persons are appointed to act judicially in a public matter, all must meet and act in the matter, although a majority may decide.

In the case of *Palmer* v. *Conway*, it was left undecided whether the provision in Revised Statutes empowering a majority to act was designed to change the common law ; but in *Hall* v. *Manchester*, 39 N. H. 301, it was held that it did empower two of the selectmen to act without the aid or presence of the other, and so in that respect did change the common law rule ; and such, it is evident, must have been the views of the court in *Andover* v. *Grafton*, *Edgerly* v. *Emerson*, and *Butler* v. *Washburn*, and such, we think, is the plain and natural import of the language. As to road commissioners and county commissioners, the court have held that a full board was necessary ; but that, I think, is based upon the peculiar provisions of the statute, and especially the one enabling the two commissioners to appoint a third in case they find the other absent or unable to attend.

I think, however, that the plain language of the law, and the construction given in other cases, must prevail, and that a major part of the railroad commissioners may act.

It will be perceived, also, that one of the most important of the duties of railroad commissioners, namely, to examine the several railroads, may be done by one of the commissioners alone, to ascertain whether they have performed their duties, or violated their charters.

In *Sanborn* v. *Fellows*, 22 N. H. 490, where the law is carefully examined by BELL, J., in respect to disqualification of a judge by reason of interest, it was held that where one fence-viewer was interested, the others could act, they being a majority of the board, and empowered to act under the Revised Statutes, chap. 1, sec. 13. He says the other two have all the powers of the whole number, and the decision of the two would be free from this objection of interest. The court says that where powers are conferred on a board the majority may act.

So it is held, also (p. 48), that the duties of fence-viewers are chiefly judicial. So in *Keyser* v. *School District*, 35 N. H. 477, it was held that a committee of three, appointed by the district, were public officers, and that a majority could act for the whole—per PERLEY, C. J. A similar doctrine was held in relation to selectmen, in *Lyman* v. *Littleton*, 50 N. H. 42.

I am therefore brought to the conclusion that the directors of these two corporations had authority to make a contract to facilitate a business they were then legally doing, and in which they had a joint interest, extending even to giving to one road the use of the other for a period not exceeding five years, provided the contract was made in good faith, and not *designed to work a fundamental change* in the business of the corporations.

Whether it was made in good faith, or whether it was calculated to work such a fundamental change, requires such an extended examination of testimony and authorities, that, with the time at my command, I am not prepared to hazard an opinion, especially in view of the manner in which the present managers of the defendant corporation acquired the control over it, which, in my judgment, calls for more than usual caution in determining those questions.

